IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA


IN RE: RED ROCK SERVICES CO., LLC, :    CIVIL ACTION
                                   :    No. 13-784
            Debtor.                :
                                   :
ROBERT H. HOLBER,                  :
Chapter 7 Trustee, of Red Rock    :
Services Co., Inc.,               :
                                   :
            Plaintiff-Appellee,    :
                                   :
                 v.                :
                                   :
SUFFOLK CONSTRUCTION COMPANY,      :
INC.,                             :
                                   :
            Defendant-Appellant.   :


                    M E M O R A N D U M

EDUARDO C. ROBRENO, J.                      December 8, 2014


**Table of Contents**

I.   INTRODUCTION.............................................. 3
II.  BACKGROUND............................................... 3
     A.   Facts.............................................. 3
          1.   Silo Point Project............................ 4
          2.   McCormack Project............................. 7
     B.   Procedural History................................. 8
III. STANDARDS OF REVIEW..................................... 10
IV.  DISCUSSION.............................................. 11
     A.   Bankruptcy Court's Authority To Issue
          Final Judgment..................................... 11
     B.   Silo Point Subcontract............................. 20
          1.   Silo Point Subcontract Balance................ 20

         a.  Denial of General's Motion for Directed
            Verdict for Lack of Evidence of Damages .... 20

         b.  Award to Subcontractor Based on Its
            Substantial Completion of the Silo Point
            Subcontract ................................ 22

     2.  Change Order No. 3 ........................... 24

         a.  The Bankruptcy Court's Holding of
            Equitable Estoppel ........................ 24

            (1) Voluntary Conduct or Representation .... 26

            (2) Reliance and Detriment ................. 29

            (3) Equitable Considerations ............... 32

         b.  General's Additional Challenges to the
            Silo Point Award .......................... 35

            (1) Waiver of Notice Defense ............... 35

            (2) Proof of Differing Site Condition ...... 36

            (3) Change Order No. 3 Damages
                Calculation ........................... 37

         c.  Award of Insurance Proceeds ............... 37

  C.  McCormack Subcontract ............................ 39

     1.  James McKay Expert Testimony .................. 39

         a.  Admissibility of Expert Testimony on
            Rebuttal .................................. 40

         b.  Daubert Challenge to Expert Testimony ...... 46

            (1) McKay's Expert Qualification ........... 47

            (2) Reliability of McKay's Testimony ....... 48

     2.  Factual Finding Regarding Reasonable
         Cost of Completion ........................... 50

  D.  Attorneys' Fees .................................. 52

  E.  Additional Procedural Challenges ................. 55

     1.  Limitation on Use of Exhibits During
         Cross-Examination ............................ 55

     2.  Grant of Motion for Protective Order .......... 55

     3.  Additional Damages Conditioned on
         $50,000 Payment .............................. 57

V.   CONCLUSION ............................................. 59

## I.   INTRODUCTION

This is a dispute between a general contractor and a subcontractor concerning the subcontractor's performance at two separate construction projects. Because during the course of the dispute--which has generated myriad factual and legal issues--the subcontractor filed for bankruptcy, the matter was tried before the Bankruptcy Court.

Before the Court is the general contractor's appeal from the final judgment of the Bankruptcy Court. For the reasons set forth below, the Court will affirm the Bankruptcy Court's decision in favor of the subcontractor.

## II.   BACKGROUND

A.   Facts[1]

Prior to its bankruptcy filing in September 2007, Red Rock Services Co., LLC ("Red Rock" or "Subcontractor") was a demolitions subcontractor. Suffolk Construction Co., Inc. ("Suffolk" or "General") is a construction general contractor. In 2006, Red Rock entered into two subcontracts with Suffolk; these related to two separate projects for which Suffolk was the general contractor. Holber v. Suffolk Constr. Co. (In re Red Rock Servs. Co.), 480 B.R. 576, 585 (Bankr. E.D. Pa. 2012).

---

[1]      Unless otherwise noted, the following facts are taken from the parties' stipulated Statement of Uncontested Facts. Ex. J-59.

1.   Silo Point Project

On July 24, 2006, Subcontractor and General entered
into a subcontract ("Silo Point subcontract") under which
Subcontractor would perform demolition work on a construction
project located in Baltimore, Maryland ("Silo Point project").
The project entailed converting an old grain silo into
condominiums Id. Suffolk, as general contractor, was under
contract with the site's owner, Silo Point II, LLC ("Silo Point"
or "Owner").

On or about November 6, 2006, while Subcontractor was
engaged in demolishing certain of the silo's vertical storage
bins, one bin detached and fell to a floor below, damaging a
portion of the building. Subcontractor stopped work to take
stock of the damage and assess how it would proceed. It
ultimately modified the demolition method it was using,
resulting in significantly increased costs. Id. at 586.
Subcontractor initially told General that it would submit a
claim to its own insurance carrier to cover these additional
costs. Id. However, on December 14, 2006, Subcontractor notified
General of its intention to submit a change order related to the
unforeseen condition (also called a differing site condition).
Id. The Silo Point subcontract required notice of intent to
submit a change order within ten business days of the event

4

triggering the claim. Silo Point Subcontract, Ex. J-2, art. 8-12. Under the Silo Point general contract, Owner would be responsible for any increased costs due to a valid differing site condition claim. Gen. Conditions of Silo Point Contract, Ex. J-1, art. 4.3.4.

On December 20, 2006, Subcontractor submitted to General its formal notification of a pending change order based on the differing site condition. On January 10, 2007, Subcontractor submitted an invoice related to the pending change order, on which General requested additional documentation and support. On February 15, 2007, Subcontractor submitted Change Order No. 1, which more thoroughly documented its request. General denied it as insufficiently supported. In re Red Rock, 480 B.R. at 586. On April 16, 2007, Subcontractor submitted Change Order No. 2, which supplemented the first change order and related to additional work performed. Id. General did not acknowledge this submission. Id. In April 2007, the parties executed a Memorandum of Understanding, wherein Subcontractor agreed to accept new staffing requirements, completion dates, and delayed payment, and to retain a consultant to report on the differing site condition. Mem. Understanding, Ex. J-30, ¶¶ 4-11. General agreed to provide reasonable cooperation with Subcontractor's differing site condition claim and to make several advance payments on behalf of Subcontractor, which

Subcontractor was obliged to make to its own subcontractors, vendors, and suppliers. Id. ¶¶ 6, 11.

On July 27, 2007, Subcontractor submitted Change Order No. 3, encompassing and superseding the previous two change orders and requesting a contract price increase. In re Red Rock, 480 B.R. at 587. Change Order No. 3 was supported by a report from Subcontractor's consultant Hill International, which concluded that the bin collapse had been caused by an unforeseeable differing site condition and calculated the resulting cost increases borne by Subcontractor. Id. General forwarded Change Order No. 3 on to Owner, who rejected it for its untimeliness and for other reasons. Id.

On September 6, 2007, General notified Subcontractor that it was in default under the subcontract. Id. When Subcontractor failed to remedy the default within the required time, General hired Terra Drilling to complete Subcontractor's work. Id. at 588. On September 13, 2007, Subcontractor filed for bankruptcy in the Eastern District of Pennsylvania.

On October 15, 2007, General responded to Owner's denial of Subcontractor's differing site condition claim (i.e., Change Order No. 3) by challenging Owner's decision and requesting a claims meeting on behalf of itself and Subcontractor. Id. at 587. On March 21, 2008, General sent Owner a Request for Equitable Adjustment ("REA"), which asserted a

number of claims and specifically included Subcontractor's differing site condition claim. Id. at 588. Owner rejected the REA and, on April 25, 2008, General filed a mechanic's lien against Owner, again including Subcontractor's differing site condition claim as support. Id. In February 2009, General and Owner settled the mechanic's lien action for $9,991,231, which represented a little under half of the total amount sought. Id.

2.   McCormack Project

On August 30, 2006, Subcontractor and General entered into a subcontract ("McCormack subcontract") under which Subcontractor would perform demolition work on a construction project located in Boston, Massachusetts ("McCormack project"). The project involved rehabilitating a federal office building. Id. at 588. During the project, Subcontractor fell behind schedule and failed to fulfill various contractual duties. Id. at 589. On April 9, 2007, General notified Subcontractor that it was in default; on April 11, 2007, General terminated the McCormack subcontract. General subsequently hired its affiliate Liberty Construction ("Liberty") to complete Subcontractor's work, although Liberty's lack of competence and General's failure to adequately supervise significantly increased costs. Id. at 609. In October 2007, after Liberty had completed a

portion of the work, General hired NASDI Construction ("NASDI") to complete the remaining demolition work for a fixed fee. Id.

B.   Procedural History

As noted, Subcontractor filed for bankruptcy on September 13, 2007. On March 18, 2008, General a filed a proof of claim, alleging it was owed substantial damages arising from alleged breach of the two subcontracts discussed above. Proof of Claim, Ex. J-57. On May 18, 2009, Subcontractor then initiated an adversary proceeding against General, alleging it was owed money by General for work performed in the two subcontracts. In Re Red Rock, 480 B.R. at 583.[2]

The Bankruptcy Court held an eight-day bench trial ending on May 17, 2011. Id. at 584. On August 30, 2012, the Bankruptcy Court issued an opinion (1) awarding damages to Subcontractor for General's breach of the Silo Point subcontract, (2) awarding damages to General for Subcontractor's breach of the McCormack subcontract, and (3) allowing General to offset its award against Subcontractor's, which resulted in a net recovery to Subcontractor. Id. at 617. The Bankruptcy Court deferred final judgment to resolve attorneys' fees and costs. Id.

---

[2]      Prior to trial, the parties filed a joint stipulation dismissing Subcontractor's McCormack project claims. Stipulation of Dismissal, Adv. No. 09-2112, ECF No. 155.

On January 2, 2013, the Bankruptcy Court resolved the attorneys' fees and costs issue, granting a net award to Subcontractor in the amount of $799,006.95 (including $304,707.63 net damages and $494,299.32 net attorneys' fees and costs) and entering final judgment.[3] Holber v. Suffolk Constr. Co. (In re Red Rock Servs. Co. II), 484 B.R. 67, 71 (Bankr. E.D. Pa. 2013). On March 15, 2013, the Bankruptcy Court ruled on Subcontractor's Motion to Amend the Order and General's related cross-motion. Holber v. Suffolk Constr. Co. (In re Red Rock Servs. Co. III), Adv. No. 09-2112, 2013 WL 1100946 (Bankr. E.D. Pa. Mar. 15, 2013). The Bankruptcy Court granted Subcontractor's motion to increase its award on the Silo Point subcontract by $135,452.00 on the basis of an inadvertent calculation error. Id. at *2. The Bankruptcy Court denied General's motion to subtract overhead and profit from Subcontractor's Silo Point subcontract recovery because General failed to raise the issue prior to judgment and, in the alternative, on the merits. Id. at *2-3.

General timely appealed the Bankruptcy Court's final judgment in the amount of $934,458.95 (including the initial net award of $799,006.95 plus the $135,452.00 adjustment) in favor

---

[3]        Before doing so, the Bankruptcy Court had the parties either consent to or object to its entry of final judgment. Order, Adv. No. 09-2112, ECF No. 201; Joint Stipulation on the Court's Jurisdiction, Adv. No. 09-2112, ECF No. 203.

of Subcontractor.   The parties have fully briefed the issues presented; as such, this appeal is ripe for review by the Court.

## III. STANDARDS OF REVIEW[4]

This is an appeal from an adversary proceeding. Therefore, the Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact[5] and reviews de novo any conclusions of law. In re Jersey City Med. Ctr., 817 F.2d 1055, 1059 (3d Cir. 1987). Mixed questions of law and fact are bifurcated in order to apply the appropriate standard to each. Ram Constr. Co. v. Am. States Ins. Co., 749 F.2d 1049, 1053 (3d Cir. 1984). Decisions of the Bankruptcy Court made within its discretion are to be reviewed by this Court for abuse of that discretion. Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze), 434 F.3d 222, 228 (3d Cir. 2006). "[A]n abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." NMSBPCSLDHB, L.P. v.

---

[4]    This Court has jurisdiction to hear appeals "from final judgments, orders, and decrees" of the Bankruptcy Court. 28 U.S.C. §§ 158(a)(1). Because the Bankruptcy Court entered final judgment on March 15, 2013, this Court properly has jurisdiction over the appeal.

[5]    Federal Rule of Bankruptcy Procedure 8013 provides that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."

Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 118 (3d Cir. 2004) (quoting In re SGL Carbon Corp., 200 F.3d 154, 159 (3d Cir. 1999)).

**IV.   DISCUSSION**

A.   Bankruptcy Court's Authority To Issue Final Judgment

General argues as a threshold matter that the Bankruptcy Court lacked constitutional authority to issue a final judgment under Stern v. Marshall, 131 S. Ct. 2594 (2011). See General's Br. 49-50. Specifically, it asserts that both parties' claims under state law relate to private rights, which means they do not fall under the Supreme Court's public rights exception and thus they may not be adjudicated by a non-Article III court. Id. General concludes that the Bankruptcy Court's opinion must instead be considered as proposed findings of fact and conclusions of law, id. at 50, which requires this Court to perform its review de novo. See Exec. Benefits Ins. Agency ["EBIA"] v. Arkison, 134 S. Ct. 2165, 2168 (2014) (holding that when, under Stern, "the Constitution does not permit a bankruptcy court to enter final judgment on a bankruptcy-related claim, the relevant statute nevertheless permits a bankruptcy court to issue proposed findings of fact and conclusions of law to be reviewed de novo by the district court"); Letter to Court

11

from General's Counsel 2, ECF No. 22 (requesting this Court to conduct a de novo review).

Under federal law, bankruptcy courts may hear and enter final judgments in "all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1). "Core proceedings," as defined by the statute, include "allowance or disallowance of claims against the estate or exemptions from property of the estate," § 157(b)(2)(B), as well as "counterclaims by the estate against persons filing claims against the estate," § 157(b)(2)(C). Bankruptcy courts may also submit proposed findings of fact and conclusions of law on a "proceeding that is not a core proceeding but that is otherwise related to a case under title 11." § 157(c)(1). Alternatively, bankruptcy courts may enter final judgment on non-core proceedings, with the consent of all the parties. § 157(c)(2).

Constitutional limitations, however, narrow a bankruptcy court's statutory authority to issue final judgments in core proceedings. See Stern, 131 S. Ct. at 2620 (holding that "[t]he Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim"). Separation-of-powers concerns and the lack of Article III tenure protections preclude bankruptcy judges from

12

exercising the judicial power of the United States. Id. at 2608-09. However, Congress may assign to non-Article III courts the power to hear a limited class of cases involving the adjudication of "public rights." See id. at 2610 (discussing the plurality opinion in N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982)). This exception encompasses cases that "flow from a federal statutory scheme," such as the one created by title 11 in the area of bankruptcy. Id. at 2614.

Bankruptcy courts therefore have clear constitutional authority to resolve claims based on federal bankruptcy law under title 11. See In re Lazy Days' RV Ctr. Inc., 724 F.3d 418, 423 (3d Cir. 2013) (holding that the bankruptcy court had subject matter jurisdiction to determine whether "an anti-assignment clause survived the Settlement Agreement it had confirmed as part of a Chapter 11 bankruptcy"--a claim based on federal bankruptcy law). Bankruptcy courts may also adjudicate claims deriving from non-bankruptcy law and state law, but only if the "action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." Stern, 131 S. Ct. at 2618. In other words, only if the claim "flows from" the federal bankruptcy scheme--by being resolvable as part of the bankruptcy process--will it fall under the public rights exception. This was the Supreme Court's recent holding in Stern.

In <u>Stern</u>, which arose in the context of an inheritance dispute, the creditor filed a proof of claim against the bankruptcy estate requesting damages relating to defamation. <u>Id.</u> at 2601. The debtor's alleged defamatory statements asserted that the creditor had "engaged in fraud to gain control of his father's assets." <u>Id.</u> The debtor responded by filing a counterclaim "for tortious interference with the gift she expected" from the creditor's father, who was also the debtor's deceased husband. <u>Id.</u> The bankruptcy court found that the two claims had some "overlap," in that both required it to determine "whether [the creditor] had in fact tortiously taken control of his father's estate." <u>Id.</u> at 2617. However, given that this determination was only one element of the counterclaim, "there was never any reason to believe that the process of adjudicating [the creditor's] proof of claim would necessarily resolve [the debtor's] counterclaim." <u>Id.</u>

Several courts applying <u>Stern</u> have affirmed bankruptcy courts' authority over claims resolved through the claims allowance process. In <u>In re New Century TRS Holdings, Inc.</u> the Third Circuit found, in a non-precedential opinion, that the bankruptcy court had constitutional authority to address a fraud claim related to a bankruptcy proceeding. <u>Carr v. New Century TRS Holdings, Inc.</u> (<u>In re New Century TRS Holdings, Inc.</u>), 544 F. App'x 70, 73 (3d Cir. 2013). Because the claim in that case

14

alleged that the debtors "fraudulently induced [the creditor] to enter into a settlement agreement concerning indisputably core proceedings" of the bankruptcy, it was "irreversibly intertwined" with the claims allowance process and thus within the court's authority. Id. Similarly, in Kurz v. EMAK Worldwide, Inc., the district court held that a state law claim by a creditor who had also filed a proof of claim was within the authority of the bankruptcy court where "the state action and proof of claim arise out of the same facts and contain the same legal question." 464 B.R. 635, 645 n.6 (D. Del. 2011); see also id. ("[T]he proof of claim is identical to the state action; therefore, it must be adjudicated in order for the bankruptcy court to resolve the proof of claim.").

Courts in other circuits have analyzed this question similarly. In In re Bernard L. Madoff Investment Securities LLC, the Second Circuit found that, because the defendants to a fraudulent transfer claim had themselves filed a proof of claim, the bankruptcy court could resolve the former claim as well: "In order to rule on that [proof of] claim, the Bankruptcy Court was required to first resolve the fraudulent transfer issue." Marshall v. Picard (In re Bernard L. Madoff Inv. Sec., LLC), 740 F.3d 81, 95 (2d Cir. 2014). In In re Sundale, Ltd., the Eleventh Circuit, in a non-precedential opinion, compared a proof of claim filed by a creditor with a recoupment counterclaim by the

estate, finding that since the two parties' theories of the case were mutually contradictory, "a resolution of the proof of claim necessarily resolves the recoupment and declaratory judgment counterclaims." Sundale, Ltd. v. Fla. Assocs. Capital Enters., LLC (In re Sundale, Ltd.), 499 Fs. App'x 887, 892 (11th Cir. 2012).

Further, though a claim may be closely related to the bankruptcy proceeding, a bankruptcy court is not, on that factor alone, vested with constitutional authority to resolve it. See Ortiz v. Aurora Health Care, Inc. (In re Ortiz), 665 F.3d 906, 914 (7th Cir. 2011) (holding that the bankruptcy court lacked constitutional authority to resolve debtors' class action suit against creditor Aurora Health Care for violations of medical privacy during the bankruptcy because "[n]othing about these decisions involved an adjudication of Aurora's proofs of claim"). Moreover, even where the counterclaim shares the factual elements of a claim the bankruptcy court has authority to resolve, if the claim can be resolved without "resolv[ing] the legal effect [of the counterclaim] flowing from those factual allegations," the court would not have authority to rule on the counterclaim. Frazin v. Haynes & Boone, L.L.P. (In re Frazin), 732 F.3d 313, 323 (5th Cir. 2013); see also id. at 323-24 (holding that debtor's malpractice counterclaim against his attorneys was sufficiently interrelated with the attorneys'

16

claim for fees that the bankruptcy court was authorized to hear it, but the debtor's related Deceptive Trade Practices Act counterclaim required different legal determinations and was therefore outside the court's authority).

Here, Subcontractor contends that its claims are directly related to General's proof of claim, and thus that the matter satisfies the Stern standard and is cognizable by the Bankruptcy Court under the public rights exception. Subcontractor's Br. 48.[6] Subcontractor is correct. The parties' respective breach of contract claims stem from the same disputes over their Silo Point and McCormack subcontracts; neither party's claim can be resolved without resolving the other's.

_____

[6]      Subcontractor also argues that General consented to the Bankruptcy Court's entry of final judgment, and that the parties' consent gave the Bankruptcy Court constitutional authority to decide the case. Subcontractor's Br. 45-46. General disputed that it truly consented, and instead contends that its hand was forced. General's Br. 50. The question of whether the parties can consent to waive the Article III issue has not yet been resolved by the Supreme Court. See EBIA v. Arkison, 134 S. Ct. at 2170 n.4 ("[T]his case does not require us to address whether EBIA in fact consented to the Bankruptcy Court's adjudication of a Stern claim and whether Article III permits a bankruptcy court, with the consent of the parties, to enter final judgment on a Stern claim. We reserve that question for another day."). Moreover, the question has not been directly addressed by the Third Circuit. As discussed below, the Bankruptcy Court had constitutional authority over Subcontractor's counterclaims because they necessarily had to be decided when considering General's proof of claim. Therefore, the Court need not decide whether the parties' consent is sufficient to waive the Article III issue, or whether General truly consented.

General is therefore mistaken that Subcontractor's claims relate to private rights only and do not implicate the public rights exception. Under these circumstances, each project will be analyzed in turn below.

For the Silo Point project, General's proof of claim alleged that Subcontractor breached the subcontract by failing to complete the demolition work required. Proof of Claim, Silo Point Summary, Ex. J-57. It asked for damages relating to the cost of completing that work after subtracting the original contract amount. Id. In Subcontractor's complaint initiating the adversary proceeding, it alleged that General had breached the contract, in that it failed to pay the remaining contract balance owed, as well as the amount represented by Change Order No. 3. Compl. ¶¶ 51-59, Adv. No. 09-2112, ECF No. 1. In resolving these claims, the Bankruptcy Court had to determine which party breached the subcontract and how much was owed to each. Clearly, these claims must have necessarily been resolved in order to complete the claims allowance process, and the Bankruptcy Court therefore was vested with constitutional authority to enter final judgment with regard to them. See Stern, 131 S. Ct. at 2618.

For the McCormack project, the same result obtains. General's proof of claim alleged that Subcontractor had breached the subcontract by abandoning the project. Proof of Claim,

18

McCormack Summary, Ex. J-57. It asked for damages relating to
the cost of completing that work after subtracting the original
contract amount. Id. In Subcontractor's complaint, it alleged
that General breached the contract by wrongfully terminating it,
and asked for the amount it was still owed under the contract.
Compl. ¶¶ 83-90. Again, the Bankruptcy Court had to determine
who breached the contract and how much each party was owed; it
could not resolve General's proof of claim without also
resolving Subcontractor's counterclaims.[7] The Bankruptcy Court
therefore also had constitutional authority to enter final
judgment on Subcontractor's claims.[8]

---

[7]       As noted above, Subcontractor dropped its McCormack
project claims prior to trial. This has no effect on the Stern
analysis because the Bankruptcy Court still heard General's
McCormack claims and Subcontractor's rebuttal. The Bankruptcy
Court had to sift through the parties' conflicting evidence in
order to adjudicate the McCormack issue, which, as part of the
proof of claim, was a core bankruptcy proceeding.

[8]       In addition, it is notable that the claims at issue
here are not merely related (or unrelated) "counterclaims by the
estate against persons filing claims against the estate." 28
U.S.C. § 157(b)(2)(C). As the Stern Court recognized,
§ 157(b)(2)(C) does not on its face exclude non-core
counterclaims; to the extent a claim does not relate to the core
proceeding, the Bankruptcy Court may not constitutionally
adjudicate it. 131 S. Ct. at 2605, 2608. By contrast,
Subcontractor's counterclaims here are by nature intimately
related to the core proceeding--they specifically deal with the
validity of the claim against the debtor. In fact, as
Subcontractor notes, its counterclaims are more properly based
on § 157(b)(2)(B), concerning "allowance or disallowance of
claims against the estate or exemptions from property of the
estate," than on § 157(b)(2)(C), which was the provision at
issue in Stern. Subcontractor's Br. 47-48. This provides further

B.   Silo Point Subcontract

The Bankruptcy Court ruled on two aspects of the Silo Point subcontract dispute. First, it found that, although Subcontractor breached the Silo Point subcontract, it did substantially complete the work. In re Red Rock, 480 B.R. at 589-91. The Bankruptcy Court therefore found that General breached the contract by failing to pay Subcontractor the outstanding balance, and it awarded the balance to Subcontractor, offset by General's expenses in completing the work. Id. Second, the Bankruptcy Court found that General breached the contract by failing to honor Subcontractor's Change Order No. 3, and awarded additional damages to Subcontractor on that basis. Id. at 591-602. In what follows, the Court will proceed through the various objections to the Bankruptcy Court's rulings.

1.   Silo Point Subcontract Balance

a.   Denial of General's Motion for Directed Verdict for Lack of Evidence of Damages

At trial, after the close of Subcontractor's case, General orally moved for a directed verdict on the Silo Point subcontract claim on the grounds that Subcontractor had not

support that the Bankruptcy Court here properly entered final judgment on these claims.

entered evidence on damages related to the subcontract balance. Trial Tr. 114:24-25, 116:8-11, Apr. 5, 2011. The Bankruptcy Court declined to rule on the motion until after trial.[9] Id. at 117:12-14. General argues that the Bankruptcy Court erred in denying its motion because Subcontractor failed to provide evidence on damages "through documents or witness testimony," and thus would merely be entitled to nominal damages. General's Br. 6. Because this issue relates to fact-finding, the Court reviews the Bankruptcy Court's denial of the motion under the clear error standard. Fed. R. Bankr. P. 8013; see also General's Br. 1; Subcontractor's Br. 9.

An examination of the record shows that sufficient evidence was admitted by the close of trial to support Subcontractor's claimed damages on the Silo Point project. The Bankruptcy Court's opinion, in Addenda I and II, cites the relevant admitted exhibits supporting each element of the damages. In re Red Rock, 480 B.R. at 618-22. The Bankruptcy Court's findings on the outstanding subcontract balance were supported by the subcontract's statement of the initial contract price, and, for each modification or payment made, copies of

---

[9]     In declining to rule on the motion--now referred to as one for judgment on partial findings--during trial, the Bankruptcy Court acted within its discretion. Fed. R. Bankr. P. 7052 (incorporating Fed. R. Civ. P. 52(c), which allows a court, after hearing the parties on an issue, to "decline to render any judgment until the close of the evidence").

Subcontractor's applications for payment, acknowledgment of payment, or other documentation of the change in balance owed.[10] Ex. J-2, J-3, J-4, J-6, J-11, J-19, J-57 pt. 3; Statement of Uncontested Facts ¶ 5, Ex. J-59. The Bankruptcy Court's findings based on Change Order No. 3 were similarly supported by extensive evidence, as discussed in both the body of the opinion and outlined in Addenda I and II. In re Red Rock, 480 B.R. at 596-602, 618-22. Therefore, there was no clear error in the Bankruptcy Court's denial of General's motion for directed verdict.

> b.   Award to Subcontractor Based on Its Substantial Completion of the Silo Point Subcontract

General contests the Bankruptcy Court's award of the remaining subcontract balance to Subcontractor, arguing that Subcontractor was not entitled to the remaining balance because it breached the subcontract. General's Br. 34. This was directly addressed by the Bankruptcy Court, which noted that "[b]oth Trustee and Suffolk agree that if I find that [Subcontractor]

---

[10]      Contrary to General's assertion that no witness testimony was submitted to support the subcontract balance, counsel for Subcontractor read into the record the deposition testimony of James G. Pierpont, the Suffolk project executive stationed at the Silo Point project. Trial Tr. 77:14-78:10, Apr. 5, 2011. That testimony corroborated the initial contract price and subsequent modifications to the balance owed--including the amounts paid to Subcontractor and other vendors General hired to complete the project. Id. at 78:16-82:6.

substantially completed its scope of work under the Silo Point subcontract, Trustee is entitled to recover damages for breach of contract." In re Red Rock, 480 B.R. at 589. The Bankruptcy Court then made the factual finding that Subcontractor substantially completed its work under the subcontract. Id. at 590. General does not point to any evidence undermining this factual finding.

In addition, General notes that a party seeking to enforce a contract must prove its own compliance. General's Br. 34 (citing Collins/Snoops Assocs., Inc. v. CJF, LLC, 190 Md. App. 146, 161-63 (Md. Ct. Spec. App. 2010)).[11] General argues that Subcontractor may not recover on the subcontract balance because it failed to show that it did not breach the contract. Id. However, as the Bankruptcy Court noted, "[t]he non-breaching party may choose between canceling the contract and continuing it, and if he elects to continue the contract, the obligations of both parties remain in effect." In re Red Rock, 480 B.R. at 589 n.13 (citing Howell v. State Farm Ins. Cos., 540 F. Supp. 2d 621, 629 (D. Md. 2008)). Because General "elected to continue with the subcontract in the face of the breaches," Subcontractor's breach did not end the contract and

---

[11]     The Bankruptcy Court noted that, under the Silo Point subcontract, Subcontractor and General agreed that Maryland law would govern any dispute arising from the project. In re Red Rock, 480 B.R. at 589; see also Ex. J-2, art. 8.17.11.

23

Subcontractor was not required to show that it did not breach the contract. Id. The Bankruptcy Court's ruling on this issue is not clearly erroneous.

> ## 2. Change Order No. 3

A substantial portion of Subcontractor's recovery on the Silo Point claim was related to General's denial of Change Order No. 3. The Bankruptcy Court held that General had waived certain elements of its challenge to the Change Order No. 3 claim. Id. at 593-94. It further held that, under a theory of equitable estoppel, General could not legally challenge the validity of this claim. Id. at 594-96. Because the Silo Point subcontract included a clause obligating General to honor any valid differing site condition claim from Subcontractor and adjust the subcontract accordingly, the Bankruptcy Court found that General had breached the subcontract by failing to honor Change Order No. 3. Id. at 592-93, 602.

> ### a. The Bankruptcy Court's Holding of Equitable Estoppel

Under the Maryland doctrine of equitable estoppel, a party is precluded by its voluntary conduct from asserting certain rights against another person where that person has relied in good faith on the party's conduct and in doing so changed his position to his detriment. Olde Severna Park

24

Improvement Ass'n. v. Barry, 982 A.2d 905, 912 (Md. Ct. Spec. App. 2009) (citing Knill v. Knill, 510 A.2d 546, 549 (Md. 1986)). The elements of equitable estoppel are: "(1) voluntary conduct or representation by the party to be estopped . . . ; (2) reliance by the estopping party; and (3) detriment to the estopping party." Catholic Univ. of Am. v. Bragunier Masonry Contractors, Inc., 775 A.2d 458, 474 (Md. Ct. Spec. App. 2001); see also Knill, 510 A.2d at 550 ("These elements are necessarily related to each other. The voluntary conduct or representation of the party to be estopped must give rise to the estopping party's reliance and, in turn, result in detriment to the estopping party."). The presence of estoppel "is a question of fact to be determined in each case." Markov v. Markov, 758 A.2d 75, 81 (Md. 2000) (citation and emphasis omitted).

The Bankruptcy Court ruled that General is equitably estopped from claiming either that Change Order No. 3 is invalid as untimely submitted, or that it is invalid because the bin collapse was not caused by a differing site condition. In re Red Rock, 480 B.R. at 594-96. According to the Bankruptcy Court, during the period following the bin collapse at Silo Point, General's conduct toward Subcontractor amounted to a representation that lack of sufficient detail and evidentiary support were in fact the sole obstacles General foresaw to Subcontractor's recovery from Owner on its differing site

25

condition claim. Id. at 595. The Bankruptcy Court found that Subcontractor relied on this representation in negotiating with General and then continuing its work on the project, taking on significant expenses it could otherwise have chosen to avoid. Id.[12]

General argues that the Bankruptcy Court erred in finding that the elements of equitable estoppel were met. General's Br. 15-18. It further argues that Subcontractor did not act in "good faith" or with "reasonable diligence," both prerequisites for equitable estoppel. Id. at 17. The Court will affirm the Bankruptcy Court's decision on this issue because, after reviewing the factual findings for clear error and the legal issues de novo, Subcontractor's claim meets all the requirements to establish equitable estoppel.

(1)   Voluntary Conduct or Representation

General argues that its conduct toward Subcontractor cannot be considered a representation because it never "affirmatively stated to [Subcontractor] that Silo Point would honor a change order." Id. at 16. Moreover, General notes that

---

[12]     The Bankruptcy Court found, in addition, that General is precluded from disputing Subcontractor's damages as they were reported in Change Order No. 3 because General relied on the change order figures when it submitted its REA to Owner and when it settled the mechanic's lien action. Id. at 597. General's specific objections related to the change order damages calculation are discussed below. See infra Section IV.B.2.b(3).

"[s]ilence will not raise an estoppel where there is no duty to speak or act." Id. (quoting Olde Severna Park, 982 A.2d at 913). In Olde Severna Park, the court found there could be no estoppel where the potentially estopped party had not communicated with the estopping parties regarding the disputed issue in any way except through its inaction. 982 A.2d at 915-17.

It is a question of fact whether General represented to Subcontractor that it would not challenge either the timeliness of Change Order No. 3 or its basis in a genuine differing site condition. Under these circumstances, the Court will apply the clear error standard to this question and, given the evidence supporting the Bankruptcy Court's conclusion, will arrive at no "definite and firm conviction that a mistake has been committed." Freidrich v. Davis, 767 F.3d 374, 377 (3d Cir. 2014) (quoting McCann v. Newman Irrevocable Trust, 458 F.3d 281, 286 (3d Cir. 2006)).

Moreover, the Bankruptcy Court's decision was not predicated on General's silence alone during the course of its interaction with Subcontractor concerning Change Order No. 3. The Bankruptcy Court's ruling on General's affirmative representation to Subcontractor relied on significant evidence beyond General's silence on the two claims it now makes. In re Red Rock, 480 B.R. at 595. General's "failure to advise" Subcontractor of the additional challenges it now raises

27

occurred within the context of its repeated "denial of the change orders due only to lack of documentation" and its "agreement to cooperate with Red Rock in the preparation and submission" of the change order. Id. The record demonstrates that General and Subcontractor engaged in a lengthy, involved interaction regarding Change Order No. 3 in which General at times communicated key information to Subcontractor and at other times deliberately withheld it. See General's Br. 16 (citing Trial Tr. 32:6-34:5, May 11, 2011); Subcontractor's Br. 13 (citing Trial Tr. 107:2-20, May 11, 2011).

In the context of an extended negotiation, standards of "fair play and honest dealing" may render a party's silence, in combination with its "words, actions, and conduct" during the negotiation, a representation for the purposes of equitable estoppel. Gould v. Transamerican Assocs., 167 A.2d 905, 911, 912 (Md. 1961) (holding that, where a mortgagee had raised a number of challenges during negotiations with the mortgagor but told the mortgagor that the mortgage was not in default at that time, the mortgagee was estopped from later raising a new challenge on the basis of which it declared the mortgage in default). Here, General had promised to reasonably cooperate with Subcontractor's submission of its change order. Ex. J-30, ¶ 6. It involved itself extensively with the process, rejecting Subcontractor's submission twice for lack of detail and

evidentiary support. Ex. J-28, J-29. The Bankruptcy Court did not clearly err in finding that these actions reasonably represented to Subcontractor that General's denials included all of General's known objections to the claim.[13]

### (2)   Reliance and Detriment

General further challenges the Bankruptcy Court's finding of equitable estoppel by disputing the elements of reliance and detriment. "The doctrine of estoppel is not applicable if the party raising it was not misled to his or her detriment." Catholic Univ. of Am., 775 A.2d at 475.

---

[13]      In addition, the Bankruptcy Court's finding that General's behavior was a representation supporting equitable estoppel does not "demonstrate[] its fundamental lack of understanding of construction contract law." General's Br. 18. General argues that it did not "adopt" (i.e., represent, for purposes of estoppel) Change Order No. 3 merely by passing the claim through to Owner. Id. at 19. It contends that the Bankruptcy Court contravened "decades" of "construction law precedent and practice" by using the claim pass-through in its estoppel analysis. Id. (citing the Contract Disputes Act, 41 U.S.C. § 7103, and related case law). Yet General mischaracterizes the Bankruptcy Court's reasoning. The Bankruptcy Court did not base its estoppel finding on the fact that General "adopted" Change Order No. 3 by submitting it to Owner. Instead, the Bankruptcy Court noted that General used the change order in its legal actions against Owner, which resulted in a settlement that General never remitted to Subcontractor. In re Red Rock, 480 B.R. at 595. It was this "dubious tactic" which the Bankruptcy Court found supported a ruling of equitable estoppel. Id. at 596. Moreover, as described above, the pass-through was not the only basis for the Bankruptcy Court's finding; it also noted General's extended interactions with Subcontractor. Therefore, General's maligning of the Bankruptcy Court is misguided.

General first contends that Subcontractor could not
have relied on any of its representations and did not suffer
detriment because, regardless of any alleged representations,
Subcontractor was contractually obligated to complete its work
pursuant to the Silo Point subcontract. General's Br. 16 (citing
Silo Point Subcontract, Ex. J-2, art. 8-12). This argument
misses the mark. Irrespective of its obligation to complete the
subcontract, Subcontractor relied on General's representations
that it would not "raise the late notice defense and its denial
of the change orders [was] due only to lack of documentation and
detail." In re Red Rock, 480 B.R. at 595. In its belief that
Change Order No. 3 would ultimately be approved--with General's
"reasonable cooperation" (Mem. Understanding, Ex. J-30, ¶ 6)--
Subcontractor "use[d] more expensive and time-intensive methods
to complete the project." In re Red Rock, 480 B.R. at 595.
General cites no authority for the proposition that a
subcontractor, in attempting to determine whether it has the
ability to satisfy its contractual obligations, cannot be
considered to "rely," for estoppel purposes, on a representation
that causes it to miscalculate that ability and delay an
inevitable breach at great expense. Moreover, General overlooks
the Bankruptcy Court's finding that Subcontractor's reliance and
detriment lay in large part in its voluntary compliance with
General's demands above and beyond the scope of the contract.

<u>Id.</u> The Bankruptcy Court found that General's representations caused Subcontractor to "spen[d] substantial money and effort to complete the project and to compile the documentation to support its bin collapse/differing site condition claim, including hiring Hill International to prepare the Hill Report to satisfy [General's] demands." <u>Id.</u> Indeed, as the Bankruptcy Court noted, in the April 2007 Memorandum of Understanding alone, Subcontractor made a number of commitments that were not required under the original subcontract, including increased staffing, guaranteed completion dates, and delays in receiving payment. <u>See</u> <u>id.</u> at 587; <u>see also</u> Mem. Understanding, Ex. J-30, ¶¶ 2-9, 11.

General also challenges Subcontractor's reliance by claiming that Subcontractor completed the demolition of the specific affected bins prior to submitting the first change order; thus Subcontractor "performed the work prior to the time that [General] could represent anything." General's Br. 18. Again, General misunderstands the Bankruptcy Court's reasoning. As discussed above, the reliance centers on General's failure to advise Subcontractor that it would deny Change Order No. 3, leading Subcontractor to increase its spending in order to successfully submit the claim and complete the project. Whether or not the specific bins had been demolished by the time the first change order was submitted is irrelevant.

31

The Bankruptcy Court's finding that Subcontractor relied to its detriment on General's representation is a factual finding subject to review for clear error. Markov, 758 A.2d at 81. Given the evidence that Subcontractor incurred additional expenses at the encouragement of General, the Bankruptcy Court did not commit clear error here.

### (3)   Equitable Considerations

Equitable estoppel may be supported by "wrongful or unconscionable conduct" by the party to be estopped, but does not require it. See Olde Severna Park, 982 A.2d at 913 ("[E]quitable estoppel may apply even in the absence of any fraud or wrongful intent to mislead, if the actions or the inaction of the party estopped . . . cause a prejudicial change in the conduct of the other." (internal quotation marks omitted)). Thus, the Bankruptcy Court reasonably considered General's attempt to collect against Owner on Subcontractor's differing site condition claim while failing to remit any portion to Subcontractor as "adding insult to injury" in assessing the equities of the case. In re Red Rock, 480 B.R. at 595.[14]

---

[14]        In its reply brief, General argues that the Bankruptcy Court committed clear error in finding that General's settlement with Owner on its mechanic's lien action included a recovery related to Change Order No. 3. General's Reply Br. 9; see also In re Red Rock, 480 B.R. at 588. This argument fails. First of

In addition, "good faith and reasonable diligence" by the estopping party are prerequisites for recovery under this theory. Olde Severna Park, 982 A.2d at 917 n.14. General challenges the Bankruptcy Court's implicit finding that Subcontractor acted with good faith and reasonable diligence, and thus argues that estoppel is inappropriate. General's Br. 17. Its arguments on this point are unpersuasive.

First, General asserts that Subcontractor failed to exercise reasonable diligence or demonstrate good faith when it failed to timely submit its claim under the subcontract, and when the claim it did submit was unsatisfactory until it had been substantially revised. Id. However, the Bankruptcy Court found that Subcontractor delayed submitting its claim because the bin collapse's cause--which underlay the differing site condition claim (i.e., the basis of Change Order No. 3)--only

---

all, it is not disputed that General pursued this claim by including the change order amount in its REA and mechanic's lien action against Owner. Stmt. of Uncontested Facts, Ex. J-59, ¶¶ 35-38. Second, the settlement General reached with Owner released all claims General had against Owner. Ex. J-58, at 94:18-95:4 (deposition testimony of Rick Slosson, Owner representative); Settlement Agmt. and Mutual Release, Ex. J-42, at 1, 3. General's argument that Owner never accepted the change order, General's Reply Br. 9, is irrelevant because part of the consideration Owner received in the settlement agreement related to General's relinquishment of its right to pursue the change order further. The Bankruptcy Court did not clearly err in finding on the basis of this evidence that the parties' settlement included recovery for Subcontractor's change order. Neither did it err in considering this evidence in its equitable estoppel analysis.

became apparent as work progressed. In re Red Rock, 480 B.R. at 586, 593. The parties had already begun communicating about the bin collapse and its potential implications immediately after the incident occurred. Id. at 586.[15] General makes no attempt to challenge these factual findings, which support the Bankruptcy Court's implicit finding that Subcontractor pursued its claim with reasonable diligence.

Second, General argues that Subcontractor acted without reasonable diligence or good faith when, prior to the bin collapse, it noticed cracks in the bins and reinforced the bins using steel plates and Hilti bolts rather than immediately informing General that cracks had been observed. General's Br. 17. However, General does not address the Bankruptcy Court's finding that "[General] failed to establish through expert testimony . . . that the cracks in issue were subsurface or otherwise concealed or unknown physical conditions that differed materially from those ordinarily found to exist." In re Red Rock, 480 B.R. at 596. Nor does General here point to any evidence indicating that the cracks themselves revealed a differing site condition of which Subcontractor failed to notify

_____

[15]     Subcontractor initially informed General that it would submit a claim to its insurance carrier in order to cover the additional costs related to the bin collapse. In re Red Rock, 480 B.R. at 586. It was only later that Subcontractor definitively concluded that the bin collapse was caused by an unforeseen condition. Id.

General. Indeed, in the transcript cited by General, Jason

Goldberg, Subcontractor's president during the relevant period,

testified that he discussed the cracks with an General

representative during a site walkthrough, and that General

specifically requested this reinforcement procedure. Trial Tr.

55:7-57:17, Apr. 4, 2011. General gives no reason to disturb the

Bankruptcy Court's finding that Subcontractor acted with

reasonable diligence and good faith in responding to the cracks

it observed. Therefore, in making its finding of equitable

estoppel, the Bankruptcy Court did not commit clear error or

apply an incorrect statement of law.

> b.   General's Additional Challenges to the Silo
>      Point Award

Given that the Court finds no clear error or incorrect

statement of law with respect to the Bankruptcy Court's finding

of equitable estoppel, several of General's additional

challenges related to the Silo Point claim are resolved or made

irrelevant.

> (1)   Waiver of Notice Defense

General contests the Bankruptcy Court's finding that

General waived its right to challenge the validity of Change

Order No. 3--a challenge predicated on Subcontractor's failure

to comply with a ten-day notice provision in the subcontract.

General's Br. 7-15; see also Silo Point Subcontract, Ex. J-2,
art. 8.12. However, as the Bankruptcy Court noted, due to
General's conduct (i.e., failure to require the enforcement of
the subcontract's notice provision), General is equitably
estopped from raising this notice defense. In re Red Rock, 480
B.R. at 593-96.[16]

(2)   Proof of Differing Site Condition

General contends that the Bankruptcy Court incorrectly
required it to prove the existence of a differing site
condition. General's Br. 21-22. It further argues that
Subcontractor had the burden of proof to demonstrate the
existence of a differing site condition, and that it failed to
do so. Id. at 22-26.

In fact, in light of the Bankruptcy Court's equitable
estoppel finding, neither party needed to prove the underlying
merit of the differing site condition claim. As the Bankruptcy
Court explained, "[General] is equitably estopped from taking

---

[16]      General also disputes the Bankruptcy Court's holding
that Subcontractor did not waive its right to pursue the change
order when it failed to hold a claims meeting with Owner as
required by the subcontract and Silo Point Contract. General's
Br. 11 n.6; see also Silo Point Contract, Ex. J-1, ¶ 4.4.1
(requiring a claims meeting as a condition precedent to
litigation). However, as the Bankruptcy Court noted, General's
correspondence to Owner states that both Subcontractor and
General had requested a claims meeting but that Owner rejected
the requests. In re Red Rock, 480 B.R. at 596; see also Tr.'s
Ex. P-31. The Bankruptcy Court did not clearly err in rejecting
General's argument here.

the position that the bin collapse was not caused by a differing site condition." <u>In re Red Rock</u>, 480 B.R. at 595. Because the Court finds no clear error or misstatement of law in this finding, it need not evaluate the proof introduced on this issue.

    (3) <u>Change Order No. 3 Damages Calculation</u>

    General asserts multiple bases for its argument that the Bankruptcy Court erred in calculating damages related to Change Order No. 3. General's Br. 26-33. However, as the Bankruptcy Court noted, "[General] . . . relied upon the full amount requested in the Change Order, and the Hill Report, when it both submitted its REA to [Owner] and when it filed, and later settled, the mechanics' [sic] lien action." <u>In re Red Rock</u>, 480 B.R. at 597. Accordingly, General is equitably estopped from challenging the Bankruptcy Court's calculation of damages related to Change Order No. 3.

    c. <u>Award of Insurance Proceeds</u>

    Finally, General maintains that the Bankruptcy Court clearly erred in awarding damages to Subcontractor as reimbursement for an insurance recovery that General received relating to the Silo Point bin collapse, arguing that Subcontractor raised these damages too late in the proceedings and did not submit any evidence in their support. General's Br.

33-34; see also In re Red Rock, 480 B.R. at 599-602. Reviewing the Bankruptcy Court's finding for clear error, the damages award was in fact supported by substantial evidence.

The Bankruptcy Court analyzed Subcontractor's argument that it should be compensated for the full amount of the insurance claim received by General, and found that only half of a $45,903.11 portion of the claim--relating to work performed by Oncore Construction--was in fact owed to Subcontractor because it was duplicative of other amounts credited to General. In re Red Rock, 480 B.R. at 601-02. General conceded at oral argument before the Bankruptcy Court that Subcontractor was entitled to half of a $44,706.11 portion of the claim as duplicative of other amounts for which General sought credit. Id. General does not offer any specific objections to the additional $1,197 portion of which the Bankruptcy Court awarded half to Subcontractor, an award which was supported by the Bankruptcy Court's review of the parties' exhibits and the relevant change orders. Id.

Moreover, although Subcontractor did not include these damages in its Memorandum of Law or Reply Memorandum of Law filed with the Bankruptcy Court, General received notice of these through Subcontractor's previously filed Proposed Findings of Fact. Id. at 599. General cites no legal authority for its objection to the Bankruptcy Court's decision to allow

38

Subcontractor to renew its request for these damages. In light of the above, the Court will hold that the Bankruptcy Court did not commit clear error in awarding these damages.

### C.   McCormack Subcontract

The Bankruptcy Court held that Subcontractor breached the McCormack subcontract. Id. at 603. It nevertheless found that Subcontractor was owed its remaining subcontract balance, and General was entitled to its reasonable cost of completing the subcontract work, resulting in a net award for General. Id. at 607, 612. In what follows, the Court will proceed through General's objections to the Bankruptcy Court's ruling.

#### 1.   James McKay Expert Testimony

Expert witness James McKay testified at trial for Subcontractor in order to counter General's affirmative defense of set-off based on the McCormack subcontract. See Subcontractor's Br. 27; In re Red Rock, 480 B.R. at 610. In calculating General's set-off costs to complete the work Subcontractor left unfinished under the McCormack subcontract, the Bankruptcy Court found, on the basis of McKay's testimony and other record evidence, that some of General's costs were inaccurate or unreasonable. In re Red Rock, 480 B.R. at 609-11. The Bankruptcy Court therefore awarded set-off damages to General for its reasonable cost to complete the subcontract

rather than its alleged actual cost, basing the calculation of reasonable cost in part on McKay's testimony. Id.

General now contests, on several grounds, the admission of McKay's testimony.

### a. Admissibility of Expert Testimony on Rebuttal

Prior to trial, the Bankruptcy Court denied General's Motion in Limine to exclude McKay's testimony. Order Denying Mot. in Limine, Adv. No. 09-2112, ECF No. 174. General now challenges that denial. General argues that, because McKay testified as part of Subcontractor's rebuttal case, his testimony was subject to the limitations imposed by Federal Rule of Civil Procedure 26(a)(2)(D)(ii).[17] General's Br. 34-35. According to General, these limitations prevent testimony by a rebuttal expert witness where, as here, no expert witness was introduced as part of the opposing party's case-in-chief. Id.

Rule 26(a)(2) specifies requirements for disclosure of expert witness testimony. Rules 26(a)(2)(B) and (C) define which experts must provide a written report and which do not, respectively, as well as what disclosures must be made for each type of expert. Rule 26(a)(2)(D)(i) provides that expert testimony must ordinarily be disclosed "at least 90 days before

---

[17]     Rule 26 is applicable to bankruptcy courts in adversary proceedings. Fed. R. Bankr. P. 7026.

the date set for trial," absent a stipulation or court order providing otherwise. However, an altered deadline--"within 30 days after the other party's disclosure"--is given for disclosure of expert testimony where it is "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)." Rule 26(a)(2)(D)(ii).

Here, Subcontractor did not designate its expert witness as falling under Rule 26(a)(2)(D)(ii). Instead, it designated McKay as a Rule 26(a)(2)(B) expert witness (falling under the timeline set by Rule 26(a)(2)(D)(i)) and disclosed his testimony in compliance with the Bankruptcy Court's discovery schedule. See Joint Pre-Trial Stmt. 39, Adv. No. 09-2112, ECF No. 105 (listing McKay as a witness Subcontractor intended to call and describing the evidence he would provide, including "Liberty's lack of progress and gross inefficiency at the McCormack Project; NASDI's work at the McCormack Project; Red Rock's work at the McCormack Project").

General responds that, regardless of how Subcontractor designated McKay, the fact that he testified during Subcontractor's rebuttal case means he was a rebuttal expert under Rule 26(a)(2)(D)(ii). General's Reply Br. 16. Because McKay was a de facto rebuttal expert, he was subject to the limitation implicit in Rule 26(a)(2)(D)(ii)--namely, that a

41

rebuttal expert's testimony is limited to "the same subject matter identified" by the opposing party's expert evidence. General's Br. 35 (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)). General argues that, since it called no expert witnesses, McKay's testimony should have been precluded. General's Reply Br. 16.

General's arguments fail for two reasons. First, none of the cases General cites supports its proposition that an expert witness testifying during the rebuttal portion of trial converts automatically into a rebuttal expert.[18] Second, even if

---

[18]     Each of General's cases either fails to confront this question or proceeds on the assumption that the rebuttal expert had already been properly designated as such. See Lindner v. Meadow Gold Dairies, Inc., 249 F.R.D. 625, 636 (D. Haw. 2008) ("As O'Bryne and Glanville are designated as rebuttal experts, however, their testimony is limited."); Carter v. Fiberboard Corp. (In re Asbestos Prods. Liab. Litig. (No. IV)), Nos. 09-74351 & 09-74410, 2012 WL 661673, at *1 (E.D. Pa. Feb. 8, 2012)) (Angell, Mag. J.) ("Subsequently, on January 28, 2011, Plaintiffs provided Defendant with the Rebuttal Expert Report of Dr. James Millette . . . ."); Bowman v. Gen. Motors Corp., 427 F. Supp. 234, 236, 238-40 (E.D. Pa. 1977) (examining the scope of a rebuttal expert's testimony rather than the expert's designation); Banks v. Hill, 978 So. 2d 663, 666 (Miss. 2008) (precluding expert testimony where party failed to properly disclose the expert); Johnson v. Grays Harbor Cmty. Hosp., No. 06-5502, 2007 WL 4510313, at *1 (W.D. Wash. Dec. 18, 2007) (noting the relevant party designated its rebuttal experts as such); NIC Holding Corp. v. Lukoil Pan Americas, No. 05-9372, 2009 WL 996408, at *3-4 (S.D.N.Y. Apr. 14, 2009) (discussing a rebuttal expert that the magistrate judge had specially granted); Allen v. Dairy Farmers of Am., Inc., No. 09-230, 2013 WL 211303, at *6 (D. Vt. Jan. 18, 2013) (admitting designated rebuttal testimony even where it "exceeds what is necessary to simply rebut Defendants' expert opinions").

General were correct regarding McKay's status as a rebuttal witness, the trial posture of this particular case militates against strict imposition of the Rule 26(a)(2)(D)(ii) limitation. As noted above, the parties stipulated before trial that Subcontractor would drop its McCormack project claims. Stipulation of Dismissal, Adv. No. 09-2112, ECF No. 155. The Silo Point claims were the only affirmative claims left for Subcontractor to pursue. Trial Tr. 6:4-18, Apr. 4, 2011.[19] In light of this, the Bankruptcy Judge described the flow of proceedings as Subcontractor presenting its Silo Point claims, followed by General's response; then General presenting its McCormack claims, followed by Subcontractor's response. Trial Tr. 220:17-221:15, May 16, 2011. For the McCormack claims, the Bankruptcy Judge characterized Subcontractor "as the adverse party and not as rebuttal." Id. at 221:8-9. Furthermore, the Bankruptcy Judge earlier noted that McKay's testimony was "arguably not . . . part of Plaintiff's rebuttal, but is part of Plaintiff's response to Defendant's presentation of damages related to the McCormack project." Order Denying Mot. in Limine, Adv. No. 09-2112, ECF No. 174. In this context, where exigencies

---

[19]    Subcontractor's counsel notified the Bankruptcy Judge on the first day of trial that, depending on the General's case-in-chief, it may present a short rebuttal case. Id. at 8:19-25. Although Subcontractor specifically referred to the possibility of calling McKay during rebuttal, General did not object at that time. Id. at 9:2-6.

have blurred the traditional trial phases, there is less
justification for imposing the strict limitations of Rule
26(a)(2)(D)(ii). Moreover, Subcontractor had properly disclosed
its intention of calling McKay, along with the substance of his
testimony. Joint Pre-Trial Stmt. 39, Adv. No. 09-2112, ECF No.
105. General received more-than-adequate notice. The usual risks
with respect to rebuttal experts--that one party seeks to
"disguise" its "tardy expert disclosure[s]" as rebuttal experts,
see In re Asbestos Prods. Liab. Litig. (No. IV), 2012 WL 661673,
at *3, or attempts to ambush the other with "alternative
theor[ies] or new facts," see Bowman v. Gen. Motors Corp., 427
F. Supp. 234, 240 (E.D. Pa. 1977)--are not present here.

　　　　In addition, General contends that, even if Rule
26(a)(2)(D)(ii) does not apply, McKay's expert testimony
nonetheless should have been precluded in the rebuttal phase of
the trial. Since General had filed a Proof of Claim based on the
McCormack project, Subcontractor bore the burden of proof to
defeat the claim. General's Br. 37. Subcontractor therefore was
required to submit its evidence on the McCormack project during
its case-in-chief rather than during its rebuttal. Id. This
analysis is incorrect. General correctly notes that a timely
filed proof of claim constitutes "prima facie evidence of the
validity and amount of the claim," Fed. R. Bankr. P. 3001(f),
and that a party opposing the proof of claim must "produce

44

evidence and show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claims themselves." In re Sacko, 394 B.R. 90, 97-98 (Bankr. E.D. Pa. 2008) (quoting Wright v. Holm (In re Holm), 931 F.2d 620, 623 (9th Cir. 1991) (quoting 3 L. King, Collier on Bankruptcy § 502.02, at 502-22 (15th ed. 1991))). However, "the ultimate burden of persuasion is always on the claimant." Id. at 98. The burden of proof does not operate as a bar to Subcontractor's expert testimony.

Finally, it is settled that the Bankruptcy Judge may "regulate, in his sound discretion, the scope of rebuttal testimony." Bowman, 427 F. Supp. at 240. The limitations of rebuttal evidence "may be relaxed at the discretion of the trial court." Zurich v. Wehr, 163 F.2d 791, 795 (3d Cir. 1947) (quoting Friend v. Commissioner, 102 F.2d 153, 155 (7th Cir. 1939)). The trial court has discretion to permit evidence on rebuttal even where it could have been offered as part of the plaintiff's case-in-chief. Id. The trial court may potentially be required to admit rebuttal evidence "where the probative value of proffered evidence is potentially high and where such evidence, though admissible on the case in chief, was unnecessary for the plaintiff to establish in its prima facie case." Weiss v. Chrysler Motors Corp., 515 F.2d 449, 458 (2d Cir. 1975). Under these circumstances, the Bankruptcy Court did

not abuse its discretion in permitting Subcontractor's expert testimony on rebuttal.[20]

> b.   Daubert Challenge to Expert Testimony

General additionally argues that McKay's testimony should not have been admitted, both because McKay was not qualified as an expert on demolition subcontracting and because his testimony on this subject was impermissibly speculative. General's Br. 38-40.

Under the Federal Rules of Evidence as interpreted in Daubert v. Merrell Dow Pharm., Inc., a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993) (interpreting Fed. R. Evid. 702). Expert testimony is admissible only where "the expert is proposing to testify to (1) scientific

---

[20]      General's contention that any expert testimony offered in a rebuttal case implicates Rule 26(a)(2)(D)(ii) is further undermined by a comparison of the scope of evidence admissible under this rule, as opposed to the scope admissible in rebuttal generally. In rebuttal, "[t]he primary rule is to exclude all evidence which has not been made necessary by the opponent's case." Zurich, 163 F.2d at 795 (quoting Friend, 102 F.2d at 155)). However, as noted above, the limitations of rebuttal evidence "may be relaxed at the discretion of the trial court." Id. On its face, this standard conflicts with Rule 26(a)(2)(D)(ii), which, according to General, allows only testimony "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Given that McKay was disclosed as a Rule 26(a)(2)(B) expert witness, the mere fact that he testified during Subcontractor's rebuttal case does not make him subject to the limitations of Rule 26(a)(2)(D)(ii).

knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Id. at 592. The judge as gatekeeper evaluates at least three distinct criteria for admissibility: (1) the expert's qualifications, (2) the reliability of the expert's methodology, and (3) the fit between the testimony offered and the facts at issue in the case. Brown v. Se. Pa. Transp. Auth. (In re Paoli R.R. Yard PCB Litig.), 35 F.3d 717, 741-43 (3rd Cir. 1994).

The standard of review for a trial court's decision to admit an expert witness is abuse of discretion. Waldorf v. Shuta, 142 F.3d 601, 626-27 (3d Cir. 1998). The party challenging the expert's admission at trial bears a "heavy burden," since the trial court's decision must be upheld "unless manifestly erroneous." Id. (quoting Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110, 114 (3d Cir. 1987) (quoting Salem v. U.S. Lines Co., 370 U.S. 31, 35 (1962))).

### (1)  McKay's Expert Qualification

General argues that McKay was not qualified to testify regarding the engagement of a replacement demolition contractor because he did not have sufficient specialized knowledge in this area. General's Br. 38. The Third Circuit has "interpreted the specialized knowledge requirement liberally." Waldorf, 142 F.3d at 625. However, "at a minimum, a proffered expert witness . . .

47

must possess skill or knowledge greater than the average layman." Id. (quoting Aloe Coal Co., 816 F.2d at 114).

Here, McKay testified that he had over thirty-five years of experience in the construction industry, including knowledge and experience in replacing subcontractors and determining the reasonable costs of their work. Trial Tr. 11:15-16:23, May 17, 2011. His experience included work as a project executive for a demolition and dismantlement contractor. Id. The Bankruptcy Court did not abuse its discretion in finding that this experience was sufficient to qualify McKay to testify about reasonable costs and procedures in replacing a demolition subcontractor.

(2) Reliability of McKay's Testimony

General argues that McKay's testimony regarding likely completion costs, had General hired NASDI rather than Liberty, was unreliable on account of its being impermissibly speculative. General's Br. 38-40. General raises this issue for the first time on appeal. Although General objected to McKay's qualifications at trial, Trial Tr. 17:7-22:15, May 17, 2011, it has not identified any portions of the record establishing that it objected to the substance of McKay's testimony. In admitting McKay as an expert witness, the Bankruptcy Court stated that it did so "subject to . . . [General] picking particular issues

48

that [it] think[s] are beyond what he should be testifying." Id. at 22:2-5. The Bankruptcy Court then invited General to object "on a question-by-question, answer-by-answer basis." Id. at 22:10-11. General did not object to the subsequent testimony it now challenges as speculative--that is, McKay's estimates of reasonable completion costs for the work completed by Liberty. Id. at 53:1-63:18.

Under the Federal Rules of Evidence, a "party may claim error in a ruling [by the trial court] to admit or exclude evidence only if the error affects a substantial right of the party" and, "if the ruling admits evidence, [the] party, on the record: (A) timely objects or moves to strike; and (B) states the specific ground, unless it was apparent from the context." Fed. R. Evid. 103(a). Because General did not raise its objection to the reliability of McKay's testimony at trial, that objection is now waived. See e.g., Kiss v. Kmart Corp., No. 97-7090, 2001 WL 568974, at *6 (E.D. Pa. May 22, 2001) (holding that plaintiff's objection to expert testimony was waived on post-trial motion where, at trial, plaintiff failed to object to the testimony after instruction to do so); Wright v. City of Phila., No. 01-6160, 2007 WL 951421, at *2-3 (E.D. Pa. Mar. 27, 2007) (Angell, Mag. J.) (holding that defendant waived its post-

trial objection to expert's reliability under <u>Daubert</u> where it did not raise this challenge at trial).[21]

    2.   <u>Factual Finding Regarding Reasonable Cost of Completion</u>

The Bankruptcy Court found that the costs General presented for its hiring of demolition subcontractor Liberty were substantially inaccurate and unreasonable. <u>In re Red Rock</u>, 480 B.R. at 609-10. Instead, the Bankruptcy Court calculated General's cost of completion for this portion of the McCormack

---

[21]      Although the Court need not reach the merits here, even if it were to do so, General's challenge would still fail. First, in order to constitute reliable scientific knowledge, the expert's proposed opinion must consist of "more than subjective belief or unsupported speculation." <u>Daubert</u>, 509 U.S. at 590. Rather, to be reliable, the opinion "must be derived by the scientific method . . . [and] supported by appropriate validation--<u>i.e.</u>, 'good grounds,' based on what is known." <u>Id.</u> A trial court's determination of reliability is reviewed for abuse of discretion. <u>Waldorf</u>, 142 F.3d at 626-27. In light of McKay's extensive testimony describing his calculations, Trial Tr. 53:1-63:18, May 17, 2011, the Bankruptcy Court did not abuse its discretion in allowing his testimony. Second, after a trial court has "determined that a witness is competent to testify as an expert, challenges to the expert's skill or knowledge go to the weight to be accorded the expert testimony rather than to its admissibility." <u>Waldorf</u>, 142 F.3d at 627 (internal quotation marks omitted). The weight accorded to particular evidence is a question for the factfinder, <u>Knight v. Otis Elevator Co.</u>, 596 F.2d 84, 88 (3d Cir. 1979), which is reviewed on appeal for clear error, <u>see</u> Fed. R. Civ. P. 52(a)(6) ("Findings of fact . . . must not be set aside unless clearly erroneous . . . ."); <u>Anderson v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 575 (1985) ("[R]eview of factual findings under the clearly-erroneous standard--with its deference to the trier of fact--is the rule, not the exception."). Again, McKay's testimony was extensive and cogent. Trial Tr. 53:1-63:18, May 17, 2011. The Bankruptcy Court did not clearly err when it relied on this evidence.

subcontract by estimating a reasonable amount, rather than by relying on the documentation provided by Liberty. Id.

General challenges these factual findings as clearly erroneous and supported only by McKay's expert testimony. General's Br. 41-44. However, the Bankruptcy Court's findings are well supported by the record. The Bankruptcy Court based its finding that Liberty's costs were unreasonable on Liberty's "production of a great number of invoices that are suspect because they either lack proper documentation, pre-date [Subcontractor's] termination, or improperly seek to charge [Subcontractor] with the cost of non-demolition work." In re Red Rock, 480 B.R. at 610 (citing as representative examples, Def.'s Ex. 2, Invoices 07-02901-0001, 07-02901-0002, 07-02901-0003, 07-02901-0004, 07-02901-0005, 07-02901-0006, and 07-02901-0007). Subcontractor identified these errors through its cross-examination of General's witness. See, e.g., Trial Tr. 27:15-41:22, Apr. 14, 2011.

Moreover, the Bankruptcy Court found Liberty's costs unreasonable because of the structure of Liberty's relationship with General. General's witnesses' testimony established that Liberty operated as one of its divisions, and that the demolition work was awarded to Liberty without a bidding process, an official contract, a formal scope of work, or any cap on Liberty's charges. See In re Red Rock, 480 B.R. at 609-

10; see also Trial Tr. 160:4-22, 163:13-165:12, Apr. 13, 2011;
Trial Tr. 95:15-21, 125:7-127:2, May 10, 2011. This record
evidence provides a "factual predicate" for McKay's expert
opinion on the reasonableness of Liberty's charges. See Pa.
Dental Ass'n. v. Med. Serv. Ass'n of Pa., 745 F.2d 248, 262 (3d
Cir. 1984) ("[T]he factual predicate of an expert's opinion must
find some support in the record." (citing Merit Motors, Inc. v.
Chrysler Corp., 569 F.2d 666, 673 (D.C. Cir. 1977) (J. Skelly
Wright, J.))). The Bankruptcy Court did not commit clear error
in finding Liberty's costs unreasonable on the basis of the
evidence discussed above.[22]

    D.   <u>Attorneys' Fees</u>

        The Bankruptcy Court found both parties to be
"prevailing parties" under the attorneys' fees provisions of the
two subcontracts, and therefore awarded attorneys' fees to both
parties under a lodestar analysis. In re Red Rock II, 484 B.R.
67, 69-70 (Bankr. E.D. Pa. 2013). General's challenge to that
award is premised on the idea that Subcontractor had engaged its
attorneys through a contingency fee agreement. General's Br. 45.
General apparently believes that, although the Bankruptcy Court

---

[22]      Neither party has identified fact testimony or
documentary evidence establishing Liberty's inexperience with
demolition, another factor mentioned by the Bankruptcy Court in
its findings. In re Red Rock, 480 B.R. at 609-10. However, the
Bankruptcy Court's overall finding is sufficiently supported by
the factual evidence identified.

delayed its decision to set a compensation structure for Subcontractor's attorneys' fees, Order 8-9, July 18, 2012, No. 07-21572, ECF No. 74, the engagement letter Subcontractor signed with its attorneys provides an independent contractual basis supporting--and rendering enforceable--the contingency fee structure. General's Reply Br. 18-19. In that case, General argues, the attorneys' fees award to Subcontractor includes fees for which Subcontractor would not actually be obligated under the contingency fee arrangement. Id.

General is incorrect. Subcontractor's March 5, 2009, engagement letter outlined a "proposed arrangement, subject to the approval" of the Bankruptcy Court. Application of Trustee, Robert H. Holber, to Employ Herrick Feinstein, LLP as Special Litigation Counsel Pursuant to 11 U.S.C. § 327, Ex. A, at 2, No. 07-21572, ECF No. 41; Application of Trustee, Robert H. Holber, to Clarify or Modify the Court's Order of March 19, 2009 Approving Employment of Special Litigation Counsel for Trustee, Ex. A, at 2, No. 07-21572, ECF No. 55. While the Bankruptcy Court approved the retention of counsel, it declined to approve the proposed compensation arrangement, or to establish any fixed compensation scheme, throughout the course of litigation. See Order Approving Employment of Special Litigation Counsel For Trustee, Mar. 19, 2009, No. 07-21572, ECF No. 46 ("[A]ny compensation and reimbursement of expenses may be had only after

Court approval . . . ."); Order on Motion to Clarify or Modify
the Court's March 19, 2009 Order Authorizing the Trustee to
Retain Herrick, Feinstein LLP as Special Litigation Counsel,
Mar. 23, 2010, No. 07-21572, ECF No. 62 (same); Order 8, July
18, 2012, No. 07-21572, ECF No. 74 ("I will determine the
Herrick Firm's compensation . . . after the principal litigation
has been substantially resolved.").

Because the Bankruptcy Court never approved the
contingency fee agreement, General's cited case law is
inapplicable. In the absence of any preexisting fee structure
approved by the Bankruptcy Court, the Bankruptcy Court was free
to determine Subcontractor's attorneys' compensation for the
first time in its January 2, 2013, opinion. In re Red Rock II,
484 B.R. at 69-70; see also Zolfo, Cooper & Co. v. Sunbeam-Oster
Co., 50 F.3d 253, 261 (3d Cir. 1995) ("If the order does not
expressly and unambiguously state specific terms and conditions
(e.g. specific hourly rates or contingency fee arrangements)
that are being approved . . . , then the terms and conditions
are merely those that apply in the absence of a specific
agreement." (quoting In re C & P Auto Transp., Inc., 94 B.R.
682, 685 n.4 (Bankr. E.D. Cal. 1988))). The Bankruptcy Court did
not abuse its discretion when it awarded attorneys' fees using
the lodestar methodology.

54

E.   Additional Procedural Challenges

1.   Limitation on Use of Exhibits During Cross-
     Examination

General contends that, after objection by

Subcontractor, the Bankruptcy Court ruled that General could not

use certain documents in its cross-examination of

Subcontractor's witness. General's Br. 47. General

mischaracterizes the trial record here. In fact, the Bankruptcy

Court declined to grant Subcontractor's objection, allowing

General to continue questioning the witness using these

documents. Trial Tr. 141:13-147:17, Apr. 4, 2011. The Bankruptcy

Court did not abuse its discretion in limiting General's use of

these documents because it did not in fact limit General's use

of them.

2.   Grant of Motion for Protective Order

General challenges as abuse of discretion the

Bankruptcy Court's grant of Subcontractor's motion for

protective order, and its accompanying deferral of General's

cross-motion to compel. See Order, Jan. 13, 2010, Adv. No. 09-

2112, ECF No. 48 (granting Subcontractor's motion for protective

order). On appeal, the Court must review discovery orders for

abuse of discretion and "will not disturb such an order absent a

showing of actual and substantial prejudice." Anderson v.

Wachovia Mortg. Corp., 621 F.3d 261, 281 (3d Cir. 2010).

Here, General contends that, as a result of the Bankruptcy Court's ruling, it was unaware until trial of Subcontractor's "position on Suffolk's Proof of Claim, [its] position on Suffolk's defenses, and [its] accounting." General's Br. 48. General further specifies that it did not have access to Subcontractor's "position on the Silo Point Subcontract balance and the McCormack Subcontract balance and [its] alleged damages." General's Reply Br. 22.

However, a review of the record indicates that General had access to this information prior to trial. Between February 23, 2010, and March 21, 2011, each of the parties filed multiple motions for summary judgment. General responded to Subcontractor's alleged damages, evidencing detailed knowledge of the information it now claims was not disclosed to it. See e.g., General's Motion for Partial Summary Judgment on Counts I, II, III, and IV, at 2-6, Adv. No. 09-2112, ECF No. 53, (analyzing each component of Subcontractor's alleged Silo Point subcontract damages, including the subcontract balance, in arguing for a reduction of the total amount claimed).

Given General's extensive pretrial access to information on the topics it identifies, and its failure to identify any specific lack of information which prejudiced its case, General fails to show any prejudice from the Bankruptcy Court's disposal of these discovery motions. The Court therefore

56

finds that the Bankruptcy Court did not abuse its discretion in granting Subcontractor's Protective Motion and in effectively denying General's Motion to Compel. See Anderson, 621 F.3d at 282 (holding district court did not abuse its discretion when no prejudice was shown to result from the court's protective order).

### 3.   Additional Damages Conditioned on $50,000 Payment

In November 2010, General identified over $1 million in additional damages on its McCormack subcontract claim, which it had not specifically identified in any prior accounting of its total claimed damages. General's Br. 48. Subcontractor filed a motion in limine to prevent General from asserting these damages. Id. Given that the trial was then scheduled to begin on December 6, 2010, the Bankruptcy Court found that General's late disclosure imposed a significant burden on Subcontractor. Order - Mot. in Limine 2, Dec. 2, 2010, Adv. No. 09-2112, ECF No. 131. The Bankruptcy Court denied Subcontractor's motion, but conditioned its denial on General's paying for certain of Subcontractor's costs in responding to the additional damages claim. Id. at 3.

General argues that the Bankruptcy Court abused its discretion in so conditioning its denial of the motion. General contends that it was not required to disclose the information at

issue because Subcontractor never requested it. General's Br. 48. However, under the Federal Rules of Civil Procedure, General was required to include in its initial pretrial disclosures "a computation of each category of damages claimed by the disclosing party," Rule 26(a)(1)(A)(iii), and to supplement those estimates as necessary throughout the course of the litigation, see Rule 26(e)(1). By General's own admission, it did not disclose its additional McCormack subcontract damages until November 2010. General's Br. 48. General also maintains that it produced other documents during discovery that included the damages information. Id. The Bankruptcy Court nevertheless held that General "failed to disclose [the information] adequately and in a meaningful way." Order - Mot. in Limine 2, Dec. 2, 2010. Upon reviewing General's brief opposing the motion in limine, it appears that this information was buried within miscellaneous correspondence and other reports, but not set out clearly as required by Rule 26(a)(1)(A)(iii). Def.'s Opp'n Mot. in Limine 4-6, Adv. No. 09-2112, ECF No. 130. Under these circumstances, the Bankruptcy Court did not err in holding these disclosures inadequate.

Further, Rule 37(c)[23] provides that where a party has failed to comply with Rule 26(a) disclosure requirements, the

---

[23]     Rule 37 is applicable to bankruptcy courts in adversary proceedings. Fed. R. Bankr. P. 7037.

Court may exclude the undisclosed information or, alternatively
or in addition, "may order payment of the reasonable expenses,
including attorney's fees, caused by the failure." Fed. R. Civ.
P. 37(c)(1)(A). That is precisely what the Bankruptcy Court did
here. It essentially allowed General to choose between two
options: admit the undisclosed damages on condition that General
pay Subcontractor's discovery costs, excluding attorneys' fees;
or exclude the undisclosed damages. General has not provided any
persuasive reason to consider this course of action improper.
Therefore, the Court finds that the Bankruptcy Court did not
abuse its discretion.

**V.    CONCLUSION**

For the reasons discussed above, the Court will affirm
in toto the decision of the Bankruptcy Court in favor of the
subcontractor Red Rock. An appropriate order follows.